UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X
In re                                            :
                                                 :      Chapter 11
ENVIROSOLUTIONS OF NEW YORK,                     :      Case No. 10-11236 (SMB)
LLC, *et al.*,                                   :      (Jointly Administered)
                                                 :
                 Reorganized Debtors.            :
------------------------------------------------------X

## MEMORANDUM DECISION AND ORDER GRANTING
## IN PART AND DENYING IN PART MOTION IN LIMINE

**A P P E A R A N C E S :**

WILLKIE FARR & GALLAGHER LLP
Counsel for the Reorganized Debtors
787 Seventh Avenue
New York, New York 10019

     John C. Longmire, Esq.
     Shaunna D. Jones, Esq.
     Jennifer J. Hardy, Esq.
        Of Counsel

REED SMITH LLP
Counsel for the PDS Debtors
Riverfront Plaza - West Tower
901 E. Byrd Street, Suite 1700
Richmond, Virginia 23219

     Betty S.W. Graumlich, Esq.
     Helenanne Connolly, Esq.
        Of Counsel

BERANBAUM MENKEN LLP
Attorneys for the Claimants
80 Pine Street, 33rd Floor
New York, New York 10005

     John A. Beranbaum, Esq.
     Christine Clark, Esq.
        Of Counsel

**STUART M. BERNSTEIN**
**United States Bankruptcy Judge:**

Bernard Griggs ("Griggs"), Norwood Sloan ("Sloan"), James Stephens ("Stephens") and Matthew Dougbey ("Dougbey") (collectively, the "Claimants") each filed proofs of claim against the bankruptcy estates of one or more of the Debtors, alleging racial discrimination and retaliation under Title VII.[1]  The Debtors objected to their claims, the Claimants submitted responses, and the parties each submitted proposed joint pre-trial orders.[2]

The Debtors argue that the facts and issues asserted in the Claimants PTO vastly expanded the scope of the permissible claims asserted in this case as limited by the charges that the Claimants presented to the United States Equal Employment Opportunity Commission ("EEOC").  They have moved *in limine* to preclude the Claimants from presenting evidence relating to (i) hostile work environment claims, (ii) events falling outside of the applicable statute of limitations, (iii) disparate treatment asserted by employees of the Debtors other than the Claimants, and (iv) "class action" theories (the "Motion").  (*See The PDS Debtors' Memorandum in Support of their Motion in Limine*, dated January 20, 2012 ("*Motion*") (ECF Doc. # 505).)  The Claimants submitted their opposition to the Motion (*see Claimants' Memorandum of Law in Opposition to Debtors' Motion in Limine*, dated February 3, 2012 ("*Opposition*") (ECF Doc. # 507)) and the Debtors filed a reply.  (*See The PDS Debtors' Reply to Claimants' Opposition to the PDS Debtors' Motion in Limine*, dated February 10, 2012 ("*Reply*") (ECF Doc. # 508).)

---

[1]    Throughout this opinion, "Title VII" shall refer to Title VII of the Civil Rights Act of 1964 §§ 701 *et seq.*, 42 U.S.C. §§ 2000e, *et seq.* (2006 & Supp. IV 2011).

[2]    A joint pre-trial order has not been entered in this case, and it appears the parties were not able to submit a consensual joint pre-trial order.  (*See Motion* at ¶ 10 n.2.)  On December 13, 2011, the parties each submitted their own proposed joint pre-trial orders.  (*See Notice of Filing of Debtors' Proposed Joint Pre-Trial Order*, dated December 13, 2011 ("*Debtors PTO*") (ECF Doc. # 499); *Claimants' Proposed Joint Pre-Trial Order*, dated December 13, 2011 ("*Claimants PTO*") (ECF Doc. # 520).)  Unless otherwise indicated, citations to ECF shall refer to the electronic docket in this case.

The Court heard oral argument on February 16, 2012.  (*See* Transcript of the hearing held February 16, 2012 ("Tr. (2/19/12)") (ECF Doc. # 510).)  At oral argument, the parties agreed that the Court could treat the Motion as seeking to strike or dismiss the Claimants' hostile work environment claims on the grounds that they were not administratively exhausted, and therefore, are time-barred.  (*See id.* at 5-6.)  As noted, the Motion raises other evidentiary issues.  For the reasons that follow, the Motion is granted to the extent of striking any hostile work environment claims asserted by Dougbey, Sloan and Stephens, and is otherwise denied.

## BACKGROUND

The Claimants are African-American, current or former employees of Potomac Disposal Service of Virginia, LLC ("PDS").  (*Claimants PTO* at ¶¶ (D) (1),(2).)  PDS is one of the debtors in the jointly administered chapter 11 cases of EnviroSolutions of New York, LLC ("EnviroSolutions New York") and its affiliates, and is a wholly owned subsidiary of debtor EnviroSolutions, Inc. ("ESI," and together with PDS and EnviroSolutions New York, the "Debtors").  The Debtors operate solid waste collection, transfer, disposal and recycling businesses in the Mid-Atlantic and Northeast regions of the United States.  PDS is one of their hauling companies, and operates in Virginia.  Generally, it provides collection services for municipal solid waste, and construction and demolition debris.  (*See Affidavit of Marc L. Bourhis, Chief Financial Officer of EnviroSolutions Holdings, Inc. and Vice President of the Debtors, in Support of Chapter 11 Petitions and First Day Pleadings*, sworn as of Mar. 9, 2010, at ¶¶ 10, 20 (ECF Doc. # 3).)

Stephens, Sloan and Griggs started working at PDS in 2004, 2005, and 2006, respectively, and currently work as roll-off drivers.[3]  (*Debtors PTO* at ¶¶ (D) (2)-(6).)  They are members of Local 639 of the International Brotherhood of the Teamsters (the "Union"), and Sloan and Stephens are union stewards.  (*Id.* at ¶¶ (D) (2)-(4).)  Dougbey started working as a driver in PDS's residential department in June 2008 and was eventually moved to the roll-off division.  PDS terminated Dougbey's employment on January 8, 2010.  (*Id.* at ¶¶ (D) (6)-(7).)  At the relevant times, the Claimants were supervised by Ray Quinlan ("Quinlan"), a White male.  PDS terminated Quinlan's employment on March 3, 2010.  (*Id.* at ¶ (D) (8).)

A.    **The Claimants' EEOC Charges**

Between November 2009 and March 2010, the Claimants filed administrative charges with the EEOC against PDS or ESI asserting claims under Title VII based on race discrimination and retaliation.  The parties generally agree that the EEOC complaints circumscribe the scope of the Claimants' bankruptcy claims although they strongly disagree on that scope.  Because the factual allegations in the EEOC charges are important to this decision, each EEOC charge is described in detail and quoted below.

1.    **Griggs's Charge**

Griggs filed his EEOC charge against PDS on December 3, 2009.[4]  He alleged that (1) after he complained about Quinlan's discriminatory conduct towards him on two separate occasions, Quinlan retaliated by "disciplining" him on several isolated dates and suspending him

---

[3]      Roll-off drivers haul either full dumpster-sized boxes (called "open tops") or fully enclosed compactors, containing construction debris, trash or recycling to various landfills, waste-to-energy incinerators or transfer stations for PDS's customers.  (*Debtors PTO* at (G) (1).)

[4]      Griggs's EEOC charge is annexed as Exhibit A to the *Opposition*.

from employment twice without pay; (2) Quinlan discriminated against him by denying him the

same opportunities and pay incentives as similarly-situated White roll-off drivers; (3) Quinlan

subjected his work to heightened scrutiny, such as unnecessarily calling him during his shift; and

(4) Quinlan gave him improper work assignments to set him up to be disciplined.  Griggs's

charge stated:

> I have been employed as a Rolloff Driver since May 2006. On or about August 26, 2008 and on or about November 12, 2009, I complained about discriminatory treatment by my immediate supervisor, Ray Quinlan, Rolloff Supervisor. After I complained, Mr. Quinlan disciplined me. Specifically, in retaliation for my complaint, Mr. Quinlan disciplined me in the beginning of August 2009, on or about September 3, 2009, and November 23, 2009. Mr. Quinlan also suspended me in the beginning of August 2009 and December 2 to December 3, 2009 with no pay. Since approximately September 15, 2008, and continuing to today, Mr. Quinlan has denied me equal opportunity to be paid higher incentives for work I completed, while other White Rolloff Drivers are paid the higher incentives, sometimes for the same routes and work. Since approximately February 6, 2009, and continuing to today, Mr. Quinlan has subjected my work to heighten scrutiny, such as unnecessarily calling me during my shift. Since approximately February 6, 2009, and continuing to today, Mr. Quinlan has repeatedly made me choose between working beyond a DOT hour restriction to accomplish extra tasks he assigns and get written up or decline the extra tasks and get written up.
>
> I believe that I have been discriminated against based on my race, Black, and in retaliation for my protected activity, in violation of Title VII of the Civil Rights Act of 1964, as amended.

### 2. Dougbey's Charge

Dougbey filed his EEOC charge against ESI on March 26, 2010.[5]  Of the four Claimants,

Dougbey's charge is the most straight-forward:  he alleged that because of his race, he was

discriminated against with respect to route assignments and "disciplinary write-ups" and,

---

[5]    Dougbey's EEOC charge is annexed as Exhibit C to *Opposition*.  According to the Motion, Dougbey filed his EEOC charge on March 10, 2010.  However, his EEOC charge is signed and dated as of March 19, 2010, and it is time-stamped as received by the EEOC field office on March 26, 2010.

ultimately, was terminated.  Unlike the other Claimants, his allegations did not mention Quinlan.

Specifically, he alleged as follows:

> In 06/2007, I was hired by the respondent to work as a Driver.  During the course
> of my employment, I was stripped of job-related routes and such routes were
> reassigned to White Drivers.  Also, during this period, I was issued numerous
> disciplinary write-ups without justification for taking time off from work.
> Finally, on 01/08/2010, I was discharged from employment.
>
> I believe that I was discriminated against based upon my race, Black, in violation
> of Title VII of the Civil Rights Act of 1964, as amended.

### 3.    Sloan's Charge

Sloan (and Stephens) generally made allegations of discrimination experienced by Black

and Hispanic employees as a whole, in addition to discrimination they experienced themselves.

In the main, they alleged that there was a pattern and practice of discrimination against Black

and Hispanic employees in favor of White employees.

Sloan filed his EEOC charge against PDS on November 30, 2009.[6]  On his EEOC form,

Sloan inserted a hand written notation that "every statement in this charge is backed by

documents."  Sloan alleged that (1) Quinlan, in his role as roll-off supervisor, used various

means to systematically reduce the earnings of non-White drivers; (2) Quinlan's preferential

treatment in favor of White drivers "demoralized" the Black and Hispanic employees; (3)

Quinlan and another supervisor, Greg Petit, retaliated against him for complaining about

discriminatory conduct to an executive officer of the company; and (4) he was subjected to

different terms and conditions of employment and given different assignments because he is

Black.  In full, he described his claims as follows:

> I was hired as a Roll-Off Driver on May 11, 2005.  Roll-Off Supervisor Ray
> Quinlan (White male) has systematically reduced the potential earnings for non-

---

[6]    Sloan's EEOC charge is annexed as Exhibit D to the *Opposition*.

6

White drivers, by cutting the Pay/Codes for work orders on our Daily Activity Logs. Mr. Quinlan is attempting to regulate/lower the income of non-White drivers but, allows White Drivers to claim higher Pay/Codes without question. Mr. Quinlan has also added to the driver pool during a seasonal reduction in available work. This action has caused more drivers to take a "stand down" during the week, resulting in a loss of income. Mr. Quinlan displays preferential treatment to White drivers, which has demoralized the Black and Hispanic employees. I complained to CEO Elliott Wallace on November 11, 2009. On November 13, 2009, erroneous instructions were given to me from Supervisor Greg Petit to pick-up and dump a container, five days a week. I was to do this, even if the container was empty. If I would have complied, I could have been fired for falsification of records. I believe Mr. Quinlan is trying to set me up for termination.

I believe I have been discriminated against (subjected to different terms/conditions of employment, not given assignments) because of my race (Black). I also believe I am being targeted for discharge, in retaliation for complaining about Mr. Quinlan's behavior. I feel Black and Hispanic drivers as a whole, are treated less favorable than Whites. I believe the employer has violated Title VII of the Civil Rights Act of 1964, as amended.

### 4.    Stephens' Charge

Stephens filed his EEOC charge against PDS on December 9, 2009.[7] Like Sloan,

Stephens alleged that Quinlan discriminated against Black and Hispanic employees by

systematically reducing their earnings as compared to the earnings of similarly-situated white

workers. Unlike Sloan, however, Stephens' allegations were not only directed at Quinlan, but at

the Debtors' management as a whole. Stephens also alleged that Black and Hispanic employees

were retaliated against through forms of discipline if they complained about Quinlan's

discriminatory conduct, and that he, specifically, received a written discipline for expressing

concerns about the racial pattern of discrimination towards Black employees. In full, Stephens

alleged the following:

I began working with the above-named employer on 12/5/1998 as a Rolloff Driver. Over the years of my employment, the name of the employer has changed but the basic organization remains the same. I am currently employed with the

---

[7]    Stephens' EEOC charge is annexed as Exhibit B to the *Opposition*.

7

Potomac Disposal Services as a Rolloff Driver.  In June 2007, Ray Quinlan (White) was hired by the employer as the Rolloff Manager and supervisor.

On or about 06/04/2007, Mr. Quinlan began to discriminate against the black and Hispanic employees that work in the same capacity.  Mr. Quinlan encourages and supports the decision of management to allow the white employees in the same position as the black and Hispanic employees to receive a higher salary.  In some instances, Mr. Quinlan has adjusted the work schedule of the white employees to receive an additional pay increase.  Mr. Quinlan does not allow any of the black or Hispanic employees the opportunity to earn a higher salary and if they question Mr. Quinlan's actions, then the black and Hispanic employees are threatened with termination or some form of discipline.  On or about 11/19/2009, I received a written discipline in retaliation for expressing concerns about the racial pattern of discrimination towards the black employees.

I believe that I have been discriminated against because of my race (Black) and subjected to retaliation in violation Title VII of the Civil Rights Act of 1964, as amended.

The EEOC issued Notices of the Right to Sue to each of the Claimants on November 22, 2010.[8]  (*Reply*, Ex. 1.)

## B.    The Bankruptcy Claims

The Debtors commenced their bankruptcy cases on March 26, 2010, and the Claimants filed timely unsecured proofs of claim on April 21, 2010.[9]  Each proof of claim, under item number 2 of the official bankruptcy form B-10, stated "race discrimination" as the basis for the claim.  No papers other than the completed proof of claim forms were submitted by the Claimants in support of their claims.

The Debtors objected to their claims on the basis that the debts were not reflected in the Debtors' books and records, and requested that their claims be disallowed and expunged in their

---

[8]    Although the Claimants proceeded *pro se* before the EEOC (and filed their proofs of claim *pro se*), the EEOC sent copies of the Notices of the Right to Sue to the Claimants' present counsel, suggesting that counsel had some involvement in that process before the EEOC terminated its processing of the Claimants' charges.

[9]    The Claimants' proofs of claim are annexed as Exhibit 1 to the Motion.

entirety.  (S*ee Debtors' Omnibus Objection to the Allowance of (A) Claims Not Consistent with the Debtors' Books and Records, (B) Duplicate Claims, (C) Satisfied Claims and (D) Late-Filed Claims (Second Omnibus Objection)*, dated June 21, 2010 (ECF Doc. # 252).)  Each Claimant submitted a *pro se* response to the Omnibus Objection (the "Responses").[10]  The Claimants are now represented by the same counsel, and on December 13, 2011, jointly submitted the Claimants PTO.  That same day, the Debtors filed the Debtors PTO.

## C.    The Motion

The Debtors argue that the Claimants PTO vastly expanded the claims originally set forth in the EEOC charges.  In addition to amplifying the EEOC charges with specific instances of disparate treatment regarding pay, work assignments, discipline and retaliation, the Claimants PTO also indicated their intention to offer evidence of a pervasive, racially offensive workplace atmosphere in support of hostile work environment claims.  This latter contention includes evidence that a White driver used the word "nigger" at the workplace (*Claimants PTO* at ¶ F(1)); White workers displayed confederate flag paraphernalia in their trucks (*id.*); at least one White driver displayed  "a black monkey figure with wide lips and clapping hands" in his or her truck (*id.*); the word "boy" was used when referring to black drivers (*id.* at ¶ (F)(2)); Supervisor Smith dismissed Sloan's complaint about Quinlan's derogatory behavior, and referred to Quinlan as "a good ol' boy" who didn't mean any harm (*id.* at ¶ (F)(3)); a White employee, Paula Crites, displayed an email of a photograph depicting two Mexican men sleeping in wheel barrels above which was written "Home Depot is having a sale on Mexican Recliners" (the "Crites Email") (*id.* at ¶ (F)(4));  a safety pamphlet that was distributed contained a caricature of an African-American man acting foolishly and spilling oil in his eye (the "Safety Poster") (*id.* at ¶ (F)(5));

---

[10]        The Responses are annexed as Exhibit 2 to the Motion.

Sloan and Stephens were retaliated against for complaining about the Crites Email and the Safety Poster to management (*id.* at ¶¶ (F)(6)-(7)); and White drivers warned Stephens and Sloan to watch their backs and to watch out for hazards placed in their trucks by angry employees.  (*Id.* at ¶ (F) (8).)

The Debtors contend that the Claimants' EEOC charges never included these hostile work environment claims, and the claims cannot be asserted for the first time in these bankruptcy cases because they are time-barred, and the Court lacks subject matter jurisdiction over them. For similar reasons, the Debtors object to the introduction of evidence of instances of discrimination that occurred more than 300 days before the Claimants filed their EEOC charges.

In addition, the Debtors challenge the Claimants' right to introduce evidence of discrimination experienced by employees other than the Claimants.  The Claimants concede, in this regard, that they are not proceeding under a "class action" or "pattern and practice" basis. (*See Opposition* at 22; Tr. (2/19/12) at 15; lines 17-19.)   Furthermore, they do not plan to offer expert or statistical evidence.  Nevertheless, they allege that Black drivers were disciplined disproportionately compared to White drivers, (*Claimants PTO* at ¶ (F)(11)), and intend to introduce the "Repeaters lists"[11] into evidence, as well as proof that a Black co-worker, Colline McDougal ("McDougal"), was subordinated to White drivers with respect to a lucrative contract at Quantico (*id.* at ¶ (F)(28)); an on-site manager at Quantico (who was not a PDS employee) "made racist jokes and casually used the word nigger, and told [McDougal] that the contract at Quanitco 'was good work for a white man' and that he and another white driver, Donny Saylers, were going to 'take this from this nigger.'"  (*Id.* at ¶ (F) (29).)  The Claimants also designated

---

[11]    Repeaters lists are records kept by PDS's safety department to track damage caused by driver accidents. (*Motion* at ¶ 11.)

Eric Evans as a witness; Evans, a non-White, apparently is an employee of PDS who worked as a driver and would likely testify to "Quinlan's negative and hostile attitude towards non-White Drivers, as well as discriminatory discipline."  (*Opposition* at 18 (internal quotation marks omitted).)

The Claimants counter that their hostile work environment claims were properly exhausted, and accordingly, they may introduce supporting evidence that includes evidence of discrimination against non-Claimant employees or other protected classes.  (*See Opposition* at 18-19.)  Alternatively, the Claimants argue that much of the challenged proof may be used as background evidence or evidence of discriminatory motive with respect to their disparate treatment claims.  (*See id.* at 14.)  They also maintain that the Repeaters lists are relevant and may be introduced to show that "White comparators were treated more favorably than their Black counterparts."  (*Id.* at 16.)

As noted above, at the hearing on the Motion the parties agreed that the Court could treat the Debtors' request to suppress evidence of a hostile work environment as a motion to strike hostile work environment claims based upon the failure to exhaust administrative remedies.  (Tr. (2/16/12) at 5-6.)  The Court will address this issue first and the remaining issues afterwards.

## DISCUSSION

### A.    Claims Under Title VII

The Claimants are pursuing individual claims[12] of intentional racial discrimination,[13] (*see*

*Opposition* at 22), and must ultimately demonstrate "that race, color, religion, sex, or national

origin was a motivating factor for [the discriminatory] employment practice, even though other

factors also motivated the practice." 42 U.S.C. § 2000e-2(m).  There is no dispute that their

EEOC charges alleged discrete acts of discrimination regarding pay, work assignments,

discipline and retaliation.  The current dispute primarily centers on whether the Claimants'

EEOC claims also asserted hostile work environment claims.

A hostile work environment is "one form of disparate treatment on the basis of 'race,

color, religion, sex, or national origin,' " *Raniola v. Bratton*, 243 F.3d 610, 617 (2d Cir. 2001)

(quoting 42 U.S.C. § 2000e-2(a) (1)), and is actionable as affecting a condition of employment.

*Cf. Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 66-67 (1986).  "Whereas other disparate

treatment claims may scrutinize discrete harms such as hiring or discharge, a hostile work

environment claim analyses a workplace environment as a whole to discover whether it is

'abusive'." *Raniola*, 243 F.3d at 617 (quoting *Harris v. Forklift Sys.*, 510 U.S. 17, 22 (1993)).  A

work environment is "abusive" "[w]hen the workplace is permeated with discriminatory

intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of

---

[12]    The Claimants have not filed class proofs of claim and concede that they are not bringing class claims or "pattern and practice" claims on behalf of others that may have suffered as a result of the Debtors' alleged discriminatory employment practices.

[13]    The statutory predicate for intentional discrimination claims under Title VII, also known as disparate treatment claims, is 42 U.S.C. § 2000e-2(a), which, in pertinent part, makes it an unlawful employment practice for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . . ."

the victim's employment and create an abusive working environment." *Harris*, 510 U.S. at 21 (internal citations and quotations marks omitted); *accord Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78 (1998). "The test has both an objective and subjective component: 'A work environment will be considered hostile if a reasonable person would have found it to be so and if the plaintiff subjectively so perceived it.' " *Pilgrim v. McGraw-Hill Cos., Inc.*, 599 F. Supp. 2d 462, 490 (S.D.N.Y. 2009) (quoting *Mormol v. Costco Wholesale Corp.*, 364 F.3d 54, 58 (2d Cir. 2004)).

When determining whether a hostile work environment exists, courts must consider the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (internal quotation marks omitted). Generally, the claim is "composed of a series of separate acts that collectively constitute one unlawful employment practice." *Id.* (internal quotation marks omitted). Moreover, the conduct of which the claimant complains "'must be sufficiently continuous and concerted in order to be deemed pervasive.'" *Pilgrim*, 599 F. Supp. 2d at 490 (quoting *Feingold v. New York*, 366 F.3d 138, 150 (2d Cir. 2004)). As to the objective prong of the test, there is no threshold number of incidents that state a claim as a matter of law, and "[t]o succeed, a plaintiff must demonstrate 'either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of her working environment.'" *Raniola*, 243 F.3d at 620 (quoting *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir. 2000)).

The law does not protect a claimant against every form of offensive conduct. "Simple teasing, offhand comments, or isolated incidents of offensive conduct . . . will not support a

13

claim of discriminatory harassment." *Petrosino v. Bell Atlantic*, 385 F.3d 210, 223 (2d Cir.

2004); *accord Leibovitz v. New York City Transit Auth.*, 252 F.3d 179, 189 (2d Cir. 2001)

(stating that merely offensive conduct "will not rise to the level of a hostile work environment").

Nevertheless, "a single act can create a hostile work environment if it in fact 'work[s] a

transformation of the plaintiff's workplace.'" *Feingold*, 366 F.3d at 150 (quoting *Alfano v.

Costello*, 294 F.3d 365, 374 (2d Cir. 2002)). "The focus of this inquiry, therefore, is 'the nature

of the environment itself.'" *Raniola*, 243 F.3d at 617 (quoting *Perry v. Ethan Allen, Inc.*, 115

F.3d 143, 150 (2d Cir. 1997)).

## B.    Title VII's Exhaustion Requirement

"Before an individual may bring a Title VII suit in federal court, the claims forming the

basis of such suit must first be presented in a complaint to the EEOC or the equivalent state

agency." *Williams v. New York City Housing Authority*, 458 F.3d 67, 69 (2d Cir. 2006) (citing

42 U.S.C. § 2000e-5); *accord Holtz v. Rockefeller & Co.*, 258 F.3d 62, 82-83 (2d Cir. 2001).

This exhaustion requirement serves "to give the administrative agency the opportunity to

investigate, mediate, and take remedial action, and enables the EEOC to provide the alleged

wrongdoer with notice and to permit possible conciliation . . . ." *Fleming v. Verizon New York,

Inc.*, 419 F. Supp. 2d 455, 462 (S.D.N.Y. 2005) (internal quotation marks and citations omitted).

It is "an essential element of Title VII's statutory scheme," *Butts v. City of N.Y. Dep't of Hous.

Pres. and Dev.*, 990 F.2d 1397, 1401 (2d Cir. 1993); *accord Legnani v. Alitalia Linee Aeree

Italiane, S.P.A.*, 274 F.3d 683, 686 (2d Cir. 2001), and is a precondition to suit. *Holtz*, 258 F.3d

at 83; *Francis v. City of New York,* 235 F. 3d 763, 768 (2d Cir. 2000).

In addition, the claimant must make the EEOC filing within the applicable limitations

period, and generally, must receive a "Notice of Right to Sue" letter from the EEOC before

bringing suit. *Williams*, 458 F.3d at 69. Here, the parties agree that the applicable limitations period is 300 days from when the claim accrued. (*See Motion* at ¶ 27; *Opposition* at 10.) "The scope of the plaintiff's right to file a federal lawsuit is determined by the charge's contents." *Jones v. Calvert Group, Ltd.*, 551 F.3d 297, 300 (4th Cir. 2009). When a claimant fails to file a timely charge with the EEOC or other appropriate State or local agency, the claim is time-barred. *Nat'l R.R. Passenger Corp.*, 536 U.S. at 109.

A court may nevertheless entertain a discrimination claim that was not asserted before the EEOC if it is "reasonably related" to those that were filed with the agency. *Deravin v. Kerik*, 335 F.3d 195, 200 (2d Cir. 2003). "A claim is considered reasonably related if the conduct complained of would fall within the 'scope of the EEOC investigation which can reasonably be expected to grow out of the charge' that was made."[14] *Fitzgerald v. Henderson*, 251 F.3d 345, 359-60 (2d Cir. 2001) (quoting *Butts*, 990 F.2d at 1402); *accord Mathirampuzha v. Potter*, 548 F.3d 70, 76 (2d Cir. 2008). "This exception to the exhaustion requirement 'is essentially an allowance of loose pleading' and is based on the recognition that 'EEOC charges frequently are filled out by employees without the benefit of counsel and that their primary purpose is to alert the EEOC to the discrimination that a plaintiff claims [he] is suffering.'" *Deravin*, 335 F.3d at 201 (quoting *Butts*, 990 F.2d at 1402).

"[T]he reasonably related inquiry requires a fact-intensive analysis." *Mathirampuzha*, 548 F.3d at 76. "[T]he focus should be 'on the factual allegations made in the [EEOC] charge itself, describing the discriminatory conduct about which a plaintiff is grieving,' " *Deravin*, 335

---

[14]    In the Second Circuit, two other types of claims are considered "reasonably related" to the claims asserted in an EEOC charge: (1) "one alleging retaliation by an employer against an employee for filing an EEOC charge," and (2) "where a plaintiff alleges further incidents of discrimination carried out in precisely the same manner alleged in the EEOC charge." *Butts*, 990 F.2d at 1402-03; *accord Deravin*, 335 F.3d 201 n.3. Neither is at issue in this case.

F.3d at 201 (quoting *Freeman v. Oakland Unified Sch. Dist.*, 291 F.3d 632, 637 (9th Cir. 2002)),

and "[t]he central question is whether the complaint filed with the EEOC gave that agency

adequate notice to investigate discrimination on both bases." *Williams*, 458 F.3d at 70 (internal

quotations marks omitted); *see Morris v. David Lerner Assocs.*, 680 F. Supp. 2d 430, 436

(E.D.N.Y. 2010).  Thus, if the allegations made in a plaintiff's federal complaint and the

allegations made in the EEOC charge rely on different facts and embody different legal theories,

it is unlikely that "the charge filed gave the EEOC adequate notice to investigate discrimination

on both bases." *Williams*, 458 F.3d at 70 (internal quotations marks omitted); *see e.g.*, *Ige v.

Command Sec. Corp.*, No. 99-CV-6916 (ILG), 2002 WL 720944, at *6 n.11 (E.D.N.Y. Mar. 12,

2002).

**C.    The Claimants' Hostile Work Environment Claims**

    **1.    Introduction**

    The Claimants maintain that the Court should construe all the EEOC charges together

and amalgamate the factual allegations to find the existence of a hostile work environment claim.

(*See Opposition* at 4 ("All of the Claimants alleged facts, when taken together, are sufficient to

allege the existence of a hostile work environment.").)  Consistent with this theory, the

Claimants string together statements from each of their EEOC charges and argue that they have

"explicitly alleged the existence of a series of incidents which were racially-motivated and which

were sufficiently continuous and concerted to have altered the conditions of their working

environment."  (*Id.* at 5 (internal quotation marks omitted).)  The Claimants do not, however, cite

any authority to support the notion that a court may jointly construe factual allegations made in

separate EEOC charges, filed by different individuals, in determining whether their individual

claims have been exhausted.  Accordingly, I find no basis to join the Claimants' EEOC charges

16

for purposes of determining whether their individual claims were administratively exhausted. Each charge shall be considered and analyzed separately.

### 2. Dougbey

Dougbey failed to allege a hostile work environment claim in his EEOC charge, and the claim is not reasonably related to the claims he asserted in his charge. Dougbey alleged that he was stripped of routes that were assigned to White drivers, received numerous disciplinary write-ups without justification and was eventually discharged.

Dougbey amplified these charges with specific examples in the Claimants PTO. Quinlan disciplined him for leaving the company yard with an inoperable alarm, but did not discipline Miller (a White driver) for intentionally disabling his own truck's alarm. (*Claimants PTO* at ¶ (F) (30).) "Dougbey received two write-ups for the same day's absence." (*Id.* at ¶ (F) (31).) Quinlan wrote up Dougbey for failing to report to work when Dougbey had valid excuses, and on one occasion, when another supervisor had given him permission to take leave. (*Id.* at ¶ (F) (32).) Finally, PDS fired Dougbey in January 2011 supposedly for scavenging worthless metal, (*id.* at ¶ (F)(33)), but the reason was a pretext, (*id.*), and "Quinlan wanted to fire Dougbey because it was the slow season, and otherwise he would have had to lay off the driver with the least seniority, Bowers, a white man." (*Id.* at ¶ (F) (37).)

These allegations involve discrete, isolated incidents, and do not allege "discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris*, 510 U.S. at 21. Accordingly, Dougbey failed to exhaust the hostile work environment claim he is now attempting to assert, and the hostile work environment claim is time-barred as to him.

17

### 3. Griggs

Griggs's EEOC complaint alleged both discrete acts of discrimination as well as a hostile work environment.  Like Dougbey, Griggs complained about Quinlan's conduct towards him. Griggs asserted that he complained about Quinlan's discriminatory treatment on two occasions (separated by fifteen months), and as a result, Quinlan retaliated by disciplining him (a year after the first complaint) and suspending him without pay.  Either as further retaliation or as separate acts of discrimination, Quinlan denied him the opportunity to earn higher pay.  Finally, he asserted that Quinlan continuously harassed him by subjecting his work to heightened scrutiny and unnecessary calls during his shift; and, Quinlan forced him to choose between getting written-up for working beyond a Department of Transportation hour restriction to complete extra tasks that Quinlan assigned to him, or, getting written-up for declining to do the extra tasks.

Once again, the Claimants PTO included several specific examples: "Quinlan harassed Griggs by repeatedly threatening to fire him for allegedly misreporting the time it took to complete the job of 'pulling' a dumpster."  (*Claimants PTO* at ¶ (F) (10).)  "Quinlan tried to discipline Griggs for an accident caused by the white driver, Miller, telling Sloan when he protested, 'Frank Miller is more believable than the boy.'"  (*Id.* ¶ (F) (19).)  When Griggs and his union representative, Stephens, raised the matter with Smith, his supervisor, Smith agreed that Griggs had "'done everything right'," but the next day, Quinlan nonetheless disciplined Griggs for "'improper reporting of damage.'" (*Id.* ¶ (F) (20).)  After Griggs complained that Quinlan's disciplinary actions were racially motivated, Quinlan retaliated against him, disciplining him five times over the course of a year and seeking to suspend him twice.  (*Id.* ¶ (F) (21).)  "In one instance, Quinlan suspended Griggs for two days for a minor accident where he ran over a small portion of a customer's lawn causing only $250 worth of damage to a lawn."  (*Id.* ¶ (F) (22).)

18

Lastly, "Quinlan harassed Griggs, continually threatening to write him up and to terminate him, keeping Griggs in perpetual fear for his job.  White drivers were not similarly harassed."  (*Id.* ¶ (F) (23).)

The allegations regarding retaliation and the denial of the chance to earn higher pay involve discrete acts.  On the other hand, allegations of continuous harassment involving increased scrutiny and telephone calls, and job assignments that amounted to efforts to sabotage Griggs and subject him to discipline involve conduct that is sufficiently severe and intimidating to alter the conditions of Griggs' employment.  *See Raniola*, 243 F.3d at 618 (concluding that, in sexual harassment suit, evidence of mistreatment, including verbal abuse, disparate treatment and workplace sabotage was sufficient for a reasonable jury to find that the plaintiff was subjected to a hostile work environment).  The substance of Griggs' hostile work environment claim is that Quinlan zeroed in on him for discriminatory reasons and through continuous harassing acts made life at PDS intolerable.

It does not follow that Griggs will be entitled to offer evidence of the racially-charged epithets and displays cited in the Claimants PTO.  (*See Claimants PTO* at ¶¶ (F) (1) (b), (1) (c), (2), (4), (5), (7).)[15]  Although these incidents are plainly associated with a hostile work environment, they do not appear to be relevant to Griggs hostile work environment claim.  They are based on different facts and evidence, do not concern conduct by Quinlan directed at Griggs and are not reasonably related to the facts alleged in Griggs' EEOC charge.  *See Ige*, No. 99-CV-6916 (ILG), 2002 WL 720944, at *6 n.11 (finding that EEOC allegations that plaintiff's

---

[15]    According to the Claimants PTO, Quinlan also referred to Griggs as a "boy," but the Claimants PTO did not state that Quinlan said it to Griggs.  Nevertheless, the reference might be admissible on issues relating to Quinlan's motive and discriminatory intent.

supervisor harassed him, failed to train him and subjected him to disciplinary sanctions would

not lead EEOC investigator to inquire into entirely different claim for hostile work environment

based on abusive treatment, profane language, ridicule and insults).

### 4.    Sloan and Stephens

Sloan and Stephens raised other claims with the EEOC, but not hostile work environment

claims.  They are union shop stewards, and complained primarily about the treatment of Blacks

and Hispanics as a class.  They alleged that the Debtors (or Quinlan) engaged in a pattern and

practice of discriminatory actions relating to pay and work assignments.  In particular, both

targeted Quinlan's manipulation of pay codes that allowed White drivers to earn higher pay at

the expense of Black and Hispanic drivers.  Sloan (but not Stephens) expressly alleged that he

had been subjected to different terms and conditions of employment and not given assignments

because of his race.[16]  Finally, Sloan alleged that Quinlan had increased the number of drivers

during a seasonable reduction in available work, resulting in loss of income, and displayed a

preference for white drivers which demoralized the Black and Hispanic employees.

Both also alleged individual retaliation claims in their EEOC complaints.  After both

complained to the Debtors' management in November 2009, Sloan alleged that another

supervisor, Greg Petit, tried to set him up to falsify records and be fired.  Stephens asserted that

on November 19, 2009, he received a written discipline "for expressing concerns about the racial

pattern of discrimination toward the black employees."

---

[16]    According to the Claimants PTO, Quinlan reassigned one of Stephens's routes to a White driver resulting in a significant loss of earnings.  (*Claimants PTO* at ¶ (F) (27)).)  His EEOC charge does not mention this incident.

Although their EEOC claims do not spell out the precise nature of their complaints to management that resulted in their retaliation claims, contemporaneous documentation does. In a November 10, 2009 letter, signed by Sloan and Stephens, they complained to the Debtors' Chief Executive Officer, Elliot Wallace, about the history of racial discrimination at PDS.[17] The letter alleged a "general atmosphere of intolerance" over the years. Most of the specific charges are directed at Quinlan. He hired a White friend (Bowers) over a Black applicant and speculated that Quinlan arranged for Bowers to be rehired after being fired. The letter also stated that Quinlan (with management's backing) systematically reduced the income of drivers by arbitrarily cutting pay codes and adding to the driver pool during seasonal reductions in available work.

The letter touched on two other matters. It attached a copy of a safety pamphlet that included the "DOS" and "DON'TS" of workplace safety. The "DON'T" depicted a "man with shaded skin, overly large lips and nose, dressed in bib overalls with a ball cap worn backward." The "DO" showed a white man in appropriate safety gear. According to Sloan and Stephens, "[t]he only thing that would have made this caricature more offensive (or more obvious) would be the addition of a watermelon." The safety pamphlet was handed out at meetings. The letter also enclosed a copy of an unidentified email found in either Sloan's or Stephens' vehicle parked on company property.

Sloan and Stephens met with Wallace and Charles Fromm, the Debtors' General Counsel, the next day, November 11, 2009, and the meeting is summarized in a December 8, 2009 letter.[18]

---

[17]    A copy of the November 10, 2009 letter is annexed to the *Opposition* as Exhibit E.

[18]    The first page of the December 8, 2009 letter was attached to the Responses filed by Sloan and Stephens which, in turn, are attached to the *Motion* as part of Exhibit 2.

According to this letter, the participants discussed Quinlan's manipulation of the pay codes to favor White drivers, the hiring of Bowers in violation of the Union contract, the racially offensive safety bulletin and a racially offensive email sent by Paula Crites (*i.e.*, the Crites Email), the mechanic shop's secretary.  According to the Claimants PTO, the Crites Email depicted the photograph of two men sleeping in wheelbarrows with the inscription referring to Home Depot's sale on Mexican recliners.  (*Claimants PTO* at ¶ (F) (4).)  I assume that this is the unidentified email referred to in the November 10 letter.

The December 8, 2009 letter also referred to events that occurred in the aftermath of the meeting.  Quinlan advised the roll-off drivers that as a result of complaints by Stephens and Sloan regarding the manipulation of pay codes, the practice had to stop.  As a result, the drivers became angry and hostile towards them.  In addition, another manager told people that Stephens and Sloan were responsible for Crites getting fired and this resulted in vandalism to the Union bulletin board and increased hostility.[19]

Once again, the Claimants PTO amplified what occurred.  White employees retaliated against Sloan and Stephens in response to Crites' firing.  Someone stuck a thumbtack in a photograph of Stephens attached to the Union bulletin board and ripped down a photograph of President Obama from the same bulletin board.  (*Id.* at ¶ (F) (7).)  In addition, "white drivers warned Stephens and Sloan to watch their back and to be careful for hazards placed in their trucks by angry employees."  (*Id.* at ¶ (F) (8).)  When Sloan and Stephens complained about the retaliation to the Debtors' General Manager, Shannon Smith, he made light of the situation and did not take any action to protect Sloan and Stephens or halt the retaliation.  (*Id.* at ¶ (F) (9).)

---

[19]    The remaining page or pages of the December 8, 2009 letter were not attached to the Responses.

The EEOC charges filed by Sloan and Stephens alleged class discrimination and personal discrimination at least as to Sloan in regard to pay and assignments as well as retaliation claims. Their charges primarily focused on Quinlan's actions. They did not allege the type of offensive racial epithets and displays that are now set out in the Claimants PTO and discussed above. In particular, they did not mention the offensive safety pamphlet and the Crites Email even though Sloan and Stephens signed their EEOC charges on November 30, 2009 and December 3, 2009, respectively, or within roughly three weeks of the meeting with Wallace and Fromm.

Furthermore, even if the reference to the meeting with management and resulting retaliation would have triggered an EEOC investigation into what transpired at the meeting, Sloan and Stephens still failed to exhaust their hostile work environment claims. Although the meeting included a discussion of the racially offensive safety pamphlet and the Crites Email, it is unreasonable to conclude that these two isolated incidents – one of which involve a mechanic's shop secretary – would cause the EEOC to investigate unrelated incidents separated by months, and in some cases, years.[20] *See Mathirampuzha*, 548 F.3d at 76 ("[T]he plaintiff's allegation of a single incident of aggression by Sacco could [not] reasonably be expected to blossom into an investigation covering allegations of unrelated misconduct by Sacco dating back several years."); *cf. Fleming*, 419 F.Supp.2d at 464 (holding that plaintiff's hostile work environment claim was not reasonably related to her EEOC charge which made only general allegations regarding her employer's disparate treatment of men and women).

---

[20] According to the *Motion*, Sloan testified at his deposition that the incident with the Confederate flag occurred in 2005 or 2006, and a co-worker's use of the "N" word was "three or four years ago." (*Motion* at ¶ 30 n.5.) In addition, the Claimants PTO states that the incident with the display of the monkey, the Confederate flag and a White driver's frequent use of the word "nigger" occurred before Quinlan arrived at PDS. (*Claimants PTO* at ¶ (F) (1).

**D.    The Debtors' Other Arguments**

The Debtors have made several other arguments in support of their motion to exclude certain types of evidence.  They maintain that the Claimants cannot offer evidence of discrimination that falls outside of the 300-day reach-back period because those claims have not been administratively exhausted and are now time-barred.  In addition, the Court should not admit evidence of alleged unfair treatment of other African-American drivers.  In particular, the Claimants intend to show that Black drivers, as a group, were disciplined more harshly than White drivers.  They also intend to call two present employees to testify regarding their own allegations of unfair discipline and perception of racially discriminatory conduct.

These arguments are premature and must await the development of the record at trial. *See Worthington v. County of Suffolk*, No. 02-CV-723 (DLI) (ARL), 2007 WL 2115038, at *5 (E.D.N.Y. July 20, 2007); *Nat'l Union Fire Ins. Co. v. L.E. Myers Co. Group*, 937 F. Supp. 276, 283 (S.D.N.Y. 1996).  For example, many of the Debtors' contentions are based on relevance and undue prejudice and delay.  Given the fact-intensive nature of the inquiry, it is difficult to judge these objections without a more developed record.

Furthermore, the fact that claims are time-barred does not affect their admissibility if they are relevant.  *Dodson v. CBS Broad. Inc.*, 423 F. Supp. 2d  331, 335 (S.D.N.Y. 2006).   In this regard, evidence of time-barred claims may be admissible as background evidence, *United Air Lines, Inc. v. Evans*, 431 U.S. 553, 558 (1977) ("A discriminatory act which is not made the basis for a timely charge . . . may constitute relevant background evidence in a proceeding in which the status of a current practice is at issue . . . ."); *Malarkey v. Texaco, Inc.*, 983 F.2d 1204, 1211 (2d Cir. 1993) (same), to establish pretext, *see Ginsburg v. Hearst Commc'ns Inc.*, No. 08-03031 (JSW), 2008 WL 4372425, at *2 (N.D. Cal. Sept. 24, 2008) (stating that facts and events

that "are not actionable on the basis that they are time barred, might be admissible at trial or on

summary judgment to provide context or to establish pretext"), or to prove discriminatory intent

or motive.  *See Collins v. Mfrs. Hanover Trust Co.*, 542 F. Supp. 663, 670 (S.D.N.Y. 1982)

(concluding that time-barred conduct "may be used . . . to illuminate current practices which,

viewed in isolation, may not indicate discriminatory motives" (internal quotation marks

omitted)).  In addition, "consideration of the entire scope of a hostile work environment claim,

including behavior alleged outside the statutory time period, is permissible for the purposes of

assessing liability, so long as an act contributing to that hostile environment takes place within

the statutory time period."  *Nat'l R.R. Pass. Corp.*, 536 U.S. at 105.  Griggs's EEOC charge

complained about Quinlan's conduct spanning more than one year, and at this point, it is not

possible to determine whether his hostile work environment claim involved continuous conduct

that occurred outside of the 300-day reach-back period. [21]

Nevertheless, there are limits on the evidence likely to be admitted.  The Claimants have

filed individual claims, not class claims or pattern and practice claims.  It is not clear that

evidence of discrimination against others is relevant to their individual claims, and they cannot

offer such evidence to show that a supervisor such as Quinlan had a propensity to discriminate

and acted in character when he allegedly discriminated against them.  *See* FED. R. EVID. 404(b)

("Evidence of a crime, wrong, or other act is not admissible to prove a person's character in

order to show that on a particular occasion the person acted in accordance with the character.").

Furthermore, witnesses can only testify to what they know personally, FED. R. EVID. 602 ("A

witness may testify to a matter only if evidence is introduced sufficient to support a finding that

---

[21]     It is unnecessary to address this issue as to Dougbey, Sloan and Stephens in light of the Court's conclusion
that they failed to exhaust hostile work environment claims.

the witness has personal knowledge of the matter."), and it is unlikely that the Claimants or their

witnesses have personal knowledge of the disciplinary actions involving other drivers, both

Black and White.  *See Leopold v. Baccarat, Inc.*, 174 F.3d 261, 271 (2d Cir. 1999).  While they

apparently seek to introduce the Repeaters lists, the facts and circumstances surrounding each

disciplinary action are unique, and the Claimants do not intend to offer any expert or statistical

evidence to show a pattern of discrimination.  Thus, evidence of discipline meted out to non-

Claimants does not appear to be relevant.  *See* FED. R. EVID. 401 ("Evidence is relevant if:  (a) it

has any tendency to make a fact more or less probable than it would be without the evidence; and

(b) the fact is of consequence in determining the action.").  Even if it was, any probative value

would likely be outweighed by undue delay.  *See* FED. R. EVID. 403 ("The court may exclude

relevant evidence if its probative value is substantially outweighed by a danger of . . . undue

delay . . . .").  Evidence of discipline involving other employees would trigger numerous mini-

trials in which the Debtors would be compelled to justify each disciplinary action.  *See*

*Moorhouse v. Boeing Co.*, 501 F. Supp. 390, 393 (E.D. Pa. 1980) ("Had the Court permitted each

of the proposed witnesses to testify about the circumstances surrounding his own lay off, each, in

essence, would have presented a prima facie case of age discrimination.  Defendants then would

have been placed in the position of either presenting the justification for each witnesses' lay off,

or of allowing the testimony to stand unrebutted."), *aff'd*, 639 F.2d 774 (3d Cir. 1980) (Table).[22]

The Debtors also object to the testimony of two other employees, Colline McDougal and

Eric Evans.  McDougal testified at his deposition about "preferential treatment of white drivers,

---

[22]    The Debtors concede "that to the extent that Claimants intend to assert that their particular disciplinary
write-ups were unfair, Claimants would be entitled to present evidence of more favorable treatment allegedly given
to similarly-situated white drivers (assuming such comparator information even existed)." (*Motion* at ¶ 40 n.9.)
However, they oppose any effort to present evidence of alleged systematic or routine unfair discipline against non-
White drivers other than the Claimants. (*Id.*)

discrimination against other non-white drivers and his 'perception' of racial hostility at PDS."
(*Opposition* at 17.)  The Claimants also expect him to testify about "his own discrimination
claim involving the reassignment of lucrative work;" and, Quinlan's unjustified threats of
discipline, harassing calls, and his tendency to socialize only with White drivers.  (*Id.*)  The
Claimants did not depose Evans, but they suggest he would testify about Quinlan's "negative and
hostile attitude towards non-White Drivers, as well as discriminatory discipline."  (*Id.* at 17-18
(internal quotation marks omitted).)

        Several of the problems discussed above in connection with the Repeaters lists are
present here.  The witnesses may lack personal knowledge of discipline meted out to others, but
even if they have personal knowledge, such testimony may open up the need for mini-trials into
the facts and circumstances surrounding that conduct.  Furthermore, anecdotal evidence of what
is essentially a pattern and practice of discrimination against Black and Hispanic drivers is likely
inadmissible to show that the Claimants were individually aggrieved by those acts of
discrimination.  Moreover, McDougal's personal perception of racial hostility seems to be
irrelevant to any of the Claimants' claims.  On the other hand, their testimony may be admissible
to show discriminatory intent, motive and pretext provided the conduct is similar in nature to the
conduct alleged by the Claimants.  *See Zubulake v. UBS Warburg LLC*, 382 F. Supp. 2d 536,
544-45 (S.D.N.Y. 2005).

        As noted, I decline to rule definitively on these other issues and prefer to await the
development of the record and hear further argument in the context of the trial.  The parties are
directed to contact chambers to arrange a conference at which to discuss the trial schedule,

including which claims or issues will be tried together, as well as their efforts to resolve these

matters.

     So ordered.


Dated: New York, New York
       July 19, 2012


             /s/ *Stuart M. Bernstein*
             STUART M. BERNSTEIN
             United States Bankruptcy Judge